## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )  2:22cr00056 |
| | )  **Electronic Filing** |
| CEDANO ANTHONY HOLYFIELD | ) |

## OPINION

On March 9, 2022, a grand jury returned a three-count indictment against Cedano Holyfield ("defendant") and his co-defendant, Jobe Franks.   Defendant is specifically charged at Counts One and Three – at Count One with conspiracy to possess with intent to distribute 400 grams or more of fentanyl, from in and around October of 2021, and continuing thereafter until in and around December of 2021, in violation of Title 21, United States Code, Section 846; and at Count Three with possession with intent to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine, on or about February 11, 2022, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi), and 841(b)(1)(B)(ii).  Presently before the court is defendant's motion to suppress ("Motion to Suppress").  See Doc. No. 60.  On August 8, 2023, an evidentiary hearing was held on the motion (the "Suppression Hearing") and the parties submitted supplemental briefs thereafter.  After careful consideration of the entire record as developed, the motion will be denied.

The background that follows is drawn from the testimony and exhibits presented at the hearing.  In 2016, Trooper Glenn Adams ("Trooper Adams") graduated from the Pennsylvania State Police Academy (the "Academy").  After Trooper Adams graduated from the Academy, he served as a patrol officer for five years where he conducted thousands of traffic stops for violations of the Pennsylvania Motor Vehicle Code.

In October of 2021, Trooper Adams was assigned to the Western Safe Highways Initiative Through Effective Law Enforcement Detention ("SHIELD") Unit within the Bureau of Criminal Investigation, Drug Law Enforcement Division, and was responsible for conducting narcotics investigations in Western Pennsylvania.  For this particular role, he received extensive training that focused on proactive policing in narcotics investigations.  This training included instruction on how to conduct narcotics interdiction on rural highways, conspiracy investigations, and behavioral trainings.  At the time of the Suppression Hearing, Trooper Adams still worked as a SHIELD officer.

Trooper Adams' training on narcotics interdiction on rural highways involved guidance on "pre-stop indicators."  Pre-stop indicators are pre-stop observations an officer can make before initiating a traffic stop that, when coupled with the totality of the circumstances and an officer's training and experience, may lead an officer to have reasonable articulable suspicion that criminal activity is occurring.  Additionally, the behavioral trainings Trooper Adams received concentrated on instructing officers on how to detect deceptive behaviors and interpret the body language of suspects in the context of law enforcement investigations.  During his time as a trooper, Trooper Adams estimated that he has received approximately 280 to 300 hours of specialized training in conducting criminal investigations.  Due to his extensive training and experience, Trooper Adams trains law enforcement officers from the Pennsylvania State Police and various other state and local agencies on how to administer criminal investigations involving narcotics interdiction on highways.

Trooper Adams first had contact with defendant during a traffic stop in October of 2021. On the morning of October 8, 2021, at approximately 11:40 A.M., Trooper Adams was working as a SHIELD patrol officer in uniform and in a marked police car.  He was patrolling the eastbound stretch of Interstate 76, that being the Pennsylvania Turnpike located between New

Stanton and Donegal, Pennsylvania.  While patrolling this area, Trooper Adams spotted a gold

Buick Enclave traveling eastbound with dark window tint which did not permit him to see into

the vehicle.  Trooper Adams believed that the Buick's window tint was in violation of Section

4524(e)(1) of the Pennsylvania Motor Vehicle Code.  Through his training and experience,

Trooper Adams was aware that individuals involved in criminal activity commonly tint their

vehicle windows to prevent others from observing criminal activity that can occur inside the

vehicle.  Further, window tint allows a criminal to "mask any sort of nervous reaction as they

pass by a trained interdiction officer."

Additionally, Trooper Adams took note that the Buick Enclave was not personalized in

any way other than the illegal window tint (i.e., the vehicle did not have a flashy license plate

cover, big wheels, bumper stickers, etc.).  This fact was significant to Trooper Adams because he

had learned through his specialized training as a SHIELD officer that individuals traveling the

interstates and involved in criminal activity "tend to want to use vehicles that blend in well with

the innocent motoring public."

Further, Trooper Adams also believed through his training and experience as a SHIELD

officer that the Buick Enclave had numerous characteristics of a vehicle that could contain

aftermarket hidden compartments or "traps."  Traps are "hidden compartments within a vehicle

for the sole purpose of transporting contraband."  Trooper Adams was very familiar with

vehicles that contain traps and often taught other members of law enforcement what to look for

in order to spot a "trap vehicle."  Taking all of the preceding facts into account, Trooper Adams

decided to stop defendant's vehicle and conduct a traffic stop.

Before stopping the Buick Enclave, Trooper Adams ran the vehicle's license plate in the

CLEAN-NCIC System, a law enforcement database that Pennsylvania law enforcement officers

utilize.  After doing so, Trooper Adams noticed that the vehicle was newly registered.  This was

a particularly important fact to Trooper Adams because he learned through his training and experience that individuals involved in criminal activity often "flip[] the tags and re-register[] the vehicles in an attempt to not have the same license plate sequence on the vehicle for an extended period of time [in order] to thwart license plate reader systems, [and] ongoing surveillance. . . ." And not only was the vehicle newly registered, it was also registered to a female named Jennifer White who lived in Pittsburgh, Pennsylvania.  Through his experience, Trooper Adams knew Pittsburgh, Pennsylvania, to be both a source area for narcotics for smaller suburbs surrounding Pittsburgh, and a source destination of drug trafficking for the Northwestern Pennsylvania region.  After running the Buick's registration, Trooper Adams pulled out from his stationary position on the highway and began pursuing the vehicle.

Trooper Adams travelled eastbound for approximately 15 minutes in order to catch up to the Buick.  Once he caught up to the Buick, Trooper Adams activated his lights and siren, and initiated a traffic stop.  Trooper Adams testified that it took defendant approximately 30 seconds to notice that he was being pulled over and then he preceded to come to "a little bit of a delayed stop."  Through his experience and training, Trooper Adams determined the delayed stop to have some significance, which only "heighten[e]d [his] suspicion" that defendant may be engaged in illegal activity.  Trooper Adams testified that "when individuals are transporting any sort of contraband . . . and there is some sort of delayed stop, typically there's a reason for that, and sometimes that is [] that [a defendant] is calling somebody to let them know that they are being traffic stopped [] [or] [s]ometimes [] they are hiding contraband within the vehicle."

After defendant came to a complete stop, Trooper Adams approached the Buick, introduced himself, explained the reason for the stop, and requested defendant's license and registration.  Although the Buick was registered to a woman from Pittsburgh, Pennsylvania, defendant was the sole occupant of the vehicle.  In response to Trooper Adams' question of who

4

the Buick belonged to, defendant indicated that the vehicle belonged to his girlfriend, Jennifer White.  After obtaining defendant's license and registration, Trooper Adams asked defendant to step out of the vehicle and follow him to his police vehicle so that he could "conduct the routine business of the traffic stop safely at [his] vehicle."  Trooper Adams routinely conducts many, if not all, traffic stops at his police vehicle for officer safety.  Video footage of the traffic stop was recorded on both Trooper Adams' body camera and by three MVR recording devices installed in his police vehicle.

When initiating the traffic stop, Trooper Adams observed that defendant "seemed nervous," and that "his hand was shaking when he handed [Trooper Adams] his registration."  Although Trooper Adams admitted that most, if not all, individuals appear nervous when they get stopped by the police, he perceived defendant's demeanor to be "excessive, especially considering what the traffic violation was."  Trooper Adams testified that defendant "remained excessively nervous" when he approached the police vehicle, even after being told that he would likely only be issued a warning for the illegal window tinting.  Based on his observations of defendant after initiating the traffic stop, coupled with the indicators he had observed when he initially saw the Buick, Trooper Adams testified that he knew at that time he was going to "extend[] the stop to confirm or expel [his] suspicion of criminal activity."

During the traffic stop, Trooper Adams questioned defendant on his reasons for traveling through the area.  Defendant explained that he was traveling to the Hagerstown Outlet Mall in Hagerstown, Maryland, to purchase winter coats for his children.  Trooper Adams thought defendant's given reason was suspicious because it was only October, he was traveling to Maryland to purchase winter coats for his children, and his children were not traveling with him.  Defendant further revealed he was only planning on staying at the outlet mall for approximately two hours.  In total, the trip from Pittsburgh, Pennsylvania, to Hagerstown, Maryland, is a six-

hour-round trip.  Trooper Adams found defendant's proffered reason for the long trip, being to purchase discounted coats for his children, to be unconvincing.  Furthermore, Trooper Adams' training and experience provided him with the insight that individuals involved in criminal activity will often make short turn-around trips, returning home after conducting their criminal activity.

While conducting a driver's license query on defendant, Trooper Adams was informed that defendant was currently on supervised release for a drug trafficking offense.  When Trooper Adams asked defendant if he had ever been arrested, defendant informed him that he previously served time in a federal prison for drug and firearm offenses.  Trooper Adams found defendant's hesitancy in answering his questions related to defendant's prior drug conviction as "odd and suspicious."  Trooper Adams also believed it to be suspicious that defendant had traveled outside the Western District of Pennsylvania, where he was being supervised, in order to purchase the discounted winter coats for his children, as he would have needed to ask for permission from his probation officer before leaving the district.  Based on these facts, Trooper Adams testified that he had "reasonable suspicion that criminal activity was afoot" and he intended to extend the traffic stop to confirm or dispel that suspicion.  Consequently, Trooper Adams ran a criminal history search on defendant.

Thereafter, Trooper Adams began using his TRACS system to prepare paperwork relative to the traffic stop while defendant continued to wait outside the front passenger-side door of the police vehicle.  The TRACS system is software law enforcement officers utilize in order to prepare citations, tickets, and criminal complaints.  However, an officer must use the CLEAN-NCIC System to gain access to an individual's criminal history, registration, license, etc. in order to input that information into the TRACS system to prepare a formal citation or warning.

While inputting defendant's information into the computer system, Trooper Adams sent his partner and fellow SHIELD member, Trooper Ryan Marmol ("Trooper Marmol"), a message requesting his assistance with the traffic stop because he planned on asking for defendant's consent to search the Buick.  As instructed, defendant continued to stand outside the front passenger-side window of the police vehicle.  He was not physically retained or handcuffed.

Trooper Adams then explained to defendant he had pulled him over for the window tint and why it was illegal, and that he would be issuing him a warning.  During this same conversation, Trooper Adams asked defendant whether there was anything illegal in the Buick, such as guns or drugs.  Defendant denied any illegal items being in his car.  Trooper Adams then inquired whether there were large amounts of U.S. currency in the Buick, to which defendant first replied "Huh?", then answered that he had "some thousands" in the car, further divulging that he had approximately $30,000.00 in cash in the vehicle.   Based on his training, experience, and the totality of the circumstances surrounding the traffic stop, Trooper Adams believed defendant was transporting a large sum of cash in order to purchase drugs.

Shortly after defendant revealed that he had a large amount of cash in the Buick, Trooper Adams asked defendant for his consent to search it.  Defendant said "no" two times.  Nonetheless, Trooper Adams voiced his concerns about the possibility of ongoing criminal activity and that he would "call a dog" to the scene.  Defendant responded "a dog? Go ahead and search," thereby consenting to a search of the Buick.  For reasons related to officer safety, Trooper Adams waited to conduct a search of the Buick until Trooper Marmol arrived on the scene.  Trooper Adams' vehicle contained a Global Positioning System ("GPS") which permitted him to see the approximate location of other troopers', including Trooper Marmol.

Although defendant was not physically restrained at any point during the traffic stop, Trooper Adams admitted that defendant was not free to leave once he made the decision to

search the vehicle.  Nevertheless, Trooper Adams did not read defendant his <u>Miranda</u> rights at any point during the stop.

      While waiting for Trooper Marmol to arrive on the scene, defendant asked Trooper Adams to "use the restroom" on the side of the highway.  Trooper Adams responded to "give him five minutes" and then he would allow him to urinate.  Thereafter, Officer Adams asked defendant a series of questions relating to the Buick, his work history, future job aspirations, the method by which he is paid, and so forth.  Officer Adams testified that he was delaying escorting defendant to "use the restroom" because he was waiting for Officer Marmol to arrive on the scene.  However, when defendant reminded Officer Adams of his need to urinate, almost exactly five minutes after defendant initially asked, Officer Adams escorted him to the side of the highway to relieve himself.  Officer Marmol arrived on the scene shortly thereafter.

      After defendant urinated, Officers Adams and Marmol proceeded to search the Buick for contraband.  During the search, defendant remained either standing behind the officers or conversing with Officer Marmol while Officer Adams continued the search of the vehicle.  Officer Adams located a Bath and Body Works shopping back in the rear seat of the vehicle containing approximately $36,500.00 in cash.  Thereafter, Officer Adams used an upholstery tool to remove the interior upholstery panels of the Buick to ensure there was not contraband hidden in secret compartments within the vehicle.  Defendant was instructed to stand on the opposite side of the highway guiderail in a "safe location" while Officer Marmol assisted Officer Adams in a final search of the vehicle.

      While defendant watched from the side of the road, the officers used a "pry tool" and handheld x-ray machine on the Buick's interior to potentially detect any aftermarket hidden compartments.  Other than the $36,500.00, the officers did not find any contraband in the Buick.

After completing the search of the Buick, Officer Adams questioned defendant about the owner and source of the large sum of cash found in the vehicle.  Defendant revealed that the money was his and that most of it came from his casino winnings at the River's Casino in Pittsburgh.  Defendant stated that he had the money on him because he was afraid to leave it at home with his girlfriend.  Defendant also revealed that he earns between $16,000.00 and $17,000.00 annually doing landscaping work.

While defendant waited with Officer Marmol, Officer Adams began completing the required paperwork related to the stop, including a Significant Drug Investigation Report ("SDIR").  A SDIR outlines the name of the involved person, date of birth, biographical information, the vehicle the individual was driving, and a synopsis of the events that transpired during the traffic stop.  Officer Adams also wrote a receipt for items that were seized from the vehicle, including the $36,500.00 cash and the Bath and Body Works bag containing it.  Thereafter, Officer Adams explained the seizure process to defendant and took a telephone call from his supervisor, Corporal Berkebile.

At the time of the traffic stop, Corporal Berkebile was a trained field officer with Homeland Security and typically handled forfeiture seizures.  While Officer Adams made his phone call, defendant was not handcuffed or restrained and was permitted to have a cigarette and retrieve a drink out of his car.  After he ended his call, Officer Adams continued to explain the principles of forfeiture to defendant, and filled out the relevant paperwork and receipt for the seized cash.  At that time, Officer Adams asked defendant to verify his address and provide a telephone number in order for the State Police to contact him regarding the seized property.  Trooper Adams recorded defendant's name and contact information, including the telephone number defendant provided, on the receipt.  Thereafter, Officer Adams again called Corporal Berkebile to inquire whether he needed any additional information from defendant before he let

him go.  Defendant remained standing outside of the police vehicle smoking a cigarette.  Officer Adams handed defendant the receipt for the cash and his business card.

At some point, Officer Adams asked defendant whether he would be amenable to coming to the State Police barracks to answer a few additional questions.  Defendant declined the invitation.

After returning to the Pennsylvania State Police barracks, and at Trooper Adams' request, a certified narcotics K-9 dog and its handler conducted a "scan" of the seized cash from defendant.  While conducting the scan, the dog "alerted" to the seized currency, meaning that the dog sensed the odor of controlled substances on the currency.

After defendant left the scene, Trooper Adams called defendant's parole agent.  The parole agent revealed that Pennsylvania State Police Trooper Dan Beatty ("Trooper Beatty"), a member of the Drug Law Enforcement Division and the Strike Force Unit, was investigating defendant for potential involvement in drug trafficking.   Officer Adams did not know that defendant was being investigated by Trooper Beatty, or by any other law enforcement officer, when he conducted the traffic stop on the Buick.  After learning this information from defendant's parole agent, Trooper Adams contacted Trooper Beatty directly.

Trooper Beatty informed Trooper Adams that defendant was under investigation by the Strike Force Unit and was identified as a "larger-scale target" by Pennsylvania State Police Trooper and Federal Bureau of Investigation ("FBI") Task Force Officer Rich Nagy ("Trooper Nagy").  Shortly after speaking with Trooper Beatty, Trooper Adams corresponded with Trooper Nagy.  At some point during their communications, Trooper Adams sent Trooper Nagy  the SDIR that he crafted containing defendant's personal information, including his telephone number, and the video footage of the traffic stop.

Trooper Nagy is a federally deputized Task Force Officer with the FBI and a Pennsylvania State Police Trooper.  He is assigned to the Bureau of Criminal Investigations, Drug Law Enforcement Division, and Southwest Strike Force Unit.  As a member of the Southwest Strike Force Unit, Trooper Nagy conducts long-term investigations into drug trafficking organizations.  He was assigned as one of the lead agents on a case investigating defendant for drug trafficking offenses.  Trooper Nagy's investigation of defendant began in May of 2021, approximately five months before the October of 2021 traffic stop.

During the course of the investigation, Trooper Nagy authored a number of affidavits of probable cause that were submitted in requests for search warrants related to defendant.  These included affidavits of probable cause related to the disclosure of defendant's cellular telephone geolocation data ("ping data") and residences believed to be utilized by defendant for the purposes of drug trafficking.  The affidavit of probable cause supporting the initial ping search warrant listed the cell phone number defendant provided to Trooper Adams during the traffic stop.  Among other things, the affidavit revealed how Trooper Nagy obtained defendant's phone number and contained information gathered from a confidential informant ("CI").  Based on the affidavit of probable cause crafted by Trooper Nagy, an application by the Washington County District Attorney's Office seeking disclosure of defendant's ping data was granted by a Washington County Common Pleas Court judge and a warrant ("Washington County ping warrant") was issued on January 25, 2022.  This specific search warrant allowed the Pennsylvania State Police to receive defendant's ping data for 60 days thereafter.

Following the expiration of the Washington County ping warrant, Trooper Nagy presented an affidavit of probable cause ("federal ping affidavit") and application to the Honorable Lisa P. Lenihan, United States Magistrate Judge for the Western District of Pennsylvania, for a warrant authorizing the disclosure of ping data for two telephone numbers.

One of the telephone numbers was the one defendant provided to Trooper Adams during the traffic stop.  The telephone number also had been later used by Trooper Nagy for the Washington County ping warrant affidavit.  The federal ping affidavit included some information about the October 2021 traffic stop, but also included information about the FBI and Pennsylvania State Police's investigation into defendant and his codefendant, Jobe Franks.  The federal ping affidavit included the details surrounding an event that occurred on November 20, 2021, which was approximately six weeks after the October 2021 traffic stop.

The affidavit outlined that a combination of physical surveillance and ping data for Mr. Franks' telephones allowed agents to observe Mr. Franks transporting a weighed shopping bag from his residence in Charleroi, Pennsylvania, to a shopping plaza parking lot in Penn Hills, Pennsylvania.  After arriving at the parking lot, agents witnessed Mr. Franks get into defendant's Acura ZDX and drive away.  The agents determined that defendant was the registered owner of the Acura by querying the license plate into a database.  Agents then observed the Acura return to the parking lot, at which time Mr. Franks emerged from the passenger side front door carrying a large weighed black bag marked "Jimmy Jazz" in white lettering.  The bag appeared to have an object inside which left a visible outline of a large rectangular object.  Agents then observed Mr. Franks drive to his Charleroi, Pennsylvania, residence and carry the weighed black bag inside. According to the federal ping affidavit presented to Magistrate Judge Lenihan, agents believed Mr. Franks met with defendant to exchange money for narcotics.  The federal ping affidavit further explained that when agents searched Mr. Franks' residence in December of 2021, approximately 251 bricks of heroin/fentanyl were located inside the same "Jimmy Jazz" bag that Mr. Franks was seen with when he exited defendant's Acura in November of 2021.  Also, the affidavit provided additional information implicating defendant's involvement with Mr. Franks in

narcotics trafficking.  Based on Trooper Nagy's affidavit and application, Magistrate Judge

Lenihan issued two ping warrants (the "federal ping warrants") on January 25, 2022.

On February 9, 2022, Trooper Nagy submitted an affidavit in support of search warrant

applications seeking authorization to search two residences related to defendant – 144 Key

Drive, Pittsburgh, Pennsylvania 15235 ("Key Drive") and 156 Cedar Ridge Drive, Apartment D-

13, Pittsburgh, Pennsylvania 15235 ("Cedar Ridge Drive").  The affidavit contained factual

averments that were also included in the federal ping affidavit, including but not limited to, (1)

defendant's criminal history; (2) intel gathered from a CI; (3) information obtained from the

October 2021 traffic stop; (4) facts surrounding the surveillance of Mr. Franks meeting defendant

in a Penn Hills shopping plaza parking lot; (5) the fruits of the search of Mr. Franks' residence,

including the 251 bricks of fentanyl and heroin found in what appeared to be the same bag agents

witnessed him carrying when exiting defendant's car; (6) information gathered from Mr. Franks'

cell phone records, including that defendant was the user of the telephone number Trooper

Adams provided to Trooper Nagy; (6) ping data obtained by investigators via the Washington

County ping warrant and the federal ping warrants supporting the inference that defendant

utilized the Key Drive and Cedar Ridge Drive residences; and (7) based on the ping data,

Trooper Nagy's belief that defendant utilized the Key Drive residence as a primary residence and

the Cedar Ridge Drive residence as a "stash house" to store narcotics, proceeds from narcotics

distribution, and other evidence of this "commission."

That same day, Trooper Nagy also submitted an identical affidavit in support of a search

warrant for another residence used by defendant – 416 Ridge Avenue, Apartment 2, Pittsburgh,

Pennsylvania 15112 ("Ridge Avenue").  Based on the submitted affidavits, the Honorable

Patricia L. Dodge, United States Magistrate Judge for the Western District of Pennsylvania,

believed there was probable cause for the requested search warrants for the Key Drive, Cedar

13

Ridge Drive, and Ridge Avenue residences and the warrants were issued on February 9, 2022, and February 10, 2022.

On February 11, 2022, the FBI executed the search warrants on Key Drive, Cedar Drive, and Ridge Avenue.  The search warrants also permitted the FBI to search defendant's person and vehicle.  Defendant was physically present at the Ridge Avenue residence when that search warrant was executed.  The searches revealed significant quantities of fentanyl and cocaine, along with guns, money, and drug packaging materials, including a pill press and pill binding powder.  Agents also executed the search warrant at Ridge Avenue that day.

Following the February of 2022 searches, the FBI arrested defendant and filed an affidavit of probable cause supporting a criminal complaint setting forth the aforementioned information.  After a preliminary examination and detention hearing, the Honorable Maureen P. Kelly, United States Magistrate Judge for the Western District of Pennsylvania, found that the submitted complaint was supported by probable cause.  Judge Kelly ordered defendant detained pending trial.

On March 9, 2022, a federal grand jury returned the aforementioned indictment against defendant.  On July 26, 2022, defendant filed his Motion to Suppress.  An evidentiary hearing on the motion was held on August 8, 2023.  The parties were permitted to file supplemental submissions in support of their respective positions through December 15, 2023.

Defendant maintains that all statements made by him to Trooper Adams during the October 8, 2021, traffic stop should be suppressed because Trooper Adams unlawfully extended the traffic stop and failed to read defendant his Miranda rights before "interrogating" him on the side of the highway.   Further, defendant moves to suppress all evidence that was seized during the execution of the various search warrants, including but not limited to, (1) the $36,500.00 that was seized during the traffic stop; (2) all quantities of alleged fentanyl; (3) all quantities of

alleged cocaine; and (4) any other evidence the government intends to use that was seized as a result of the unlawful interrogation and executed search warrants, as well as the fruits derived therefrom.

Defendant argues that although he gave verbal consent to Trooper Adams to search the Buick, Trooper Adams unlawfully searched the Buick and illegally seized the $36,500.00 because the consent was obtained during an unlawfully extended traffic stop and unlawful interrogation. Trooper Adams assertedly extended the traffic stop by unlawfully conducting a criminal investigation and interrogating defendant without advising him of his Miranda rights. At the time the traffic stop was extended, Trooper Adams purportedly did not have reasonable, articulable suspicion that criminal activity was occurring, except for the Buick's illegal window tint. Through this unlawful extended stop and interrogation, Trooper Adams elicited defendant's personal cell phone number, which was later used to obtain the Washington County ping warrants and the federal ping warrants. This ping data was then utilized by law enforcement to draft "tainted affidavits" and obtain search warrants for the Key Drive, Cedar Drive, and Ridge Avenue residences as well as defendant's person and vehicle. Consequently, defendant asserts that all evidence that was obtained as a result of the unlawfully extended stop and interrogation is fruit of the poisonous tree and must be suppressed.

The government contends that the initial stop of the Buick due to its window tint was based on probable cause and was not unduly prolonged. Further, Trooper Adams lawfully seized the $36,500.00 from the Buick after defendant consented to a search of the vehicle. Moreover, the information utilized by Trooper Nagy in the warrant affidavits properly was obtained and led to the lawful recovery of the drugs that form the basis of the charges in the indictment. The government thus maintains that all evidence obtained pursuant to the warrants should not be suppressed because the affidavits contained probable cause, and the good faith exception applies

in any event.  Consequently, it argues that defendant's constitutional rights have not been violated and the Motion to Suppress should be denied.

Traffic stops are categorized as a type of Terry stop that may be initiated based on a reasonable suspicion that a traffic violation has occurred.  Navarette v. California, 572 U.S. 393 (2014); United States v. Delfin-Colina, 464 F.3d 392, 396-97 (3d Cir. 2006) (the applicable standard for conducting a traffic stop is reasonable suspicion, not probable cause).  Defendant does not challenge the legality of the initial traffic stop[1] of the Buick due to its illegal window tint.[2]  Therefore, the Court will only address the parties' dispute of whether the traffic stop was unreasonably extended in violation of the Fourth Amendment.  Illinois v. Caballes, 543 U.S. 405, 407 (2005).

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes."  United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018).  "Once a valid traffic stop is initiated, 'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.'"

---

[1]     As related to the case at hand, reasonable suspicion exists to justify a traffic stop when a vehicle has dark tinted windows in violation of Pennsylvania law.  See United States v. Johnson, 452 F. App'x 219, 225 (3d Cir. 2011); United States v. Gooch, 915 F. Supp. 2d 690, 704 (W.D. Pa. 2012) (finding vehicle stop was based on reasonable suspicion where trooper who was experienced in highway interdiction credibly testified that he observed heavy tint on driver's side windows as the vehicle passed him going the speed limit even though he was in a minimally lit area at night).

[2]     While defendant does not challenge the lawfulness of the initial stop of the Buick, he does make reference to Trooper Adams' subjective intent of conducting the traffic stop by stating "it is peculiar that a narcotics investigator would be conducting traffic stops on an interstate highway for tinted windows."  Defendant's Motion to Suppress, Doc. No. 60, Page 9.  However, the Third Circuit has made clear that an officer's subjective intent in conducting a traffic stop is "immaterial" and should not be considered by the district court in assessing "reasonableness" as it relates to the standard of reasonable suspicion.  See United States v. Hunter, 88 F.4th 221, 224 (3d Cir. 2023).

United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) (quoting United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003)).

The Supreme Court explained in Rodriguez v. United States that a traffic stop's purpose is "to address the traffic violation that warranted the stop and attend to related safety concerns." 575 U.S. 348, 354 (2015) (citation omitted). "[T]asks ordinarily ... tied to the mission of a traffic stop ... include: 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020) (quoting Rodriguez, 575 U.S. at 355). An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop" absent reasonable suspicion. Rodriguez, 575 U.S. at 355, 135 S.Ct. 1609. The time at which a stop is measurably extended — "when tasks tied to the traffic stop are completed or reasonably should have been completed"— is known as the "'Rodriguez moment.'" Garner, 961 F.3d at 270. If an officer measurably extends a stop, a court must "assess whether the facts available to [the officer] at [the Rodriguez moment] were sufficient to establish reasonable suspicion" of criminal activity which in turn will determine whether the extension violated the Fourth Amendment. Green, 897 F.3d at 179.

Here, Trooper Adams had reasonable suspicion that criminal activity was afoot even before he extended the traffic stop. To expand the scope of a traffic stop beyond its initial purpose, an officer must have "a reasonable, articulable suspicion of criminal activity." Givan, 320 F.3d at 458. Reasonable suspicion "is more than 'a mere hunch ... [but] considerably less than ... a preponderance of the evidence, and obviously less than ... probable cause.'" Green, 897 F.3d at 183 (alterations in original) (quoting Navarette, 572 U.S. at 397). Its existence must be evaluated under the totality of the circumstances and "cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and

plausible, innocent explanations are offered for each." Id. (quoting District of Columbia v. Wesby, ⸺ U.S. ⸺, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018)).

The Court of Appeals for the Third Circuit has also "recognize[d] the particular ability of law enforcement officers, based on training and experience, to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. (internal quotation marks omitted). "Reasonable suspicion depends on both the 'information possessed by police and its degree of reliability.'" Garner, 961 F.3d at 271 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). District courts must "review reasonableness through an objective lens, and should not consider the actual or subjective intentions of the officer involved." United States v. Hunter, 88 F.4th 221, 224 (3d Cir. 2023) (cleaned up). "Courts give considerable deference to police officers' determinations of reasonable suspicion." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006).

Defendant contends that an officer must have reasonable suspicion that criminal activity is occurring, apart from the traffic violation at issue, in order to make any traffic-related inquiries that go past checking a driver's license, searching for outstanding warrants, or inspecting a vehicle's insurance and registration. He argues that in the case at hand, Trooper Adams did not have reasonable suspicion to extend the traffic stop beyond those above-identified actions. The government argues, and Trooper Adams testified, that based on his training and experience he made a number of observations during the stop that enabled him to develop reasonable suspicion to extend it and ask defendant to search the Buick.

Neither party provided the Court with their view of when the earliest Rodriguez moment occurred. Despite this, the Court concludes that under the totality of the circumstances, viewed objectively, the facts available to Trooper Adams were sufficient to establish reasonable suspicion that criminal activity was afoot even before he had finished making his initial traffic-

related inquiries of defendant.  See United States v. Folks, 452 F. Supp. 3d 238, 251 (W.D. Pa. 2020) ("In evaluating the officer's actions, the Court must defer to the 'officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed.' ... [Additionally], the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion." (citations omitted)).  Moreover, all of the events that transpired thereafter only further strengthened Trooper Adams' reasonable suspicion.  Therefore, even if the Court were to agree with defendant that all of Trooper Adams' questioning throughout the stop relating to defendant's family, employment, criminal history, etc. measurably extended the traffic stop, there was no Fourth Amendment violation if Trooper Adams had reasonable suspicion before he began this line of questioning.  See Garner, 961 F.3d at 271.

Before even initiating the traffic stop, Trooper Adams began acquiring reasonable suspicion that defendant might be engaging in criminal activity.  Trooper Adams observed multiple indicators of drug trafficking that, when taken together and viewed through his eyes as a trained SHIELD officer, provided him with reasonable suspicion to extend the stop.  Even before initiating the stop, Trooper Adams immediately noticed that the vehicle had dark window tint, was approximately five to ten years old, and was plain in nature.  Through Trooper Adams' training and experience, he knew that drug traffickers commonly utilize these types of vehicles in order to transport or smuggle contraband.

After stopping the Buick and interacting with defendant and prior to requesting to search, Trooper Adams noticed two signs of nervousness: (1) defendant's hands were visibly shaking; and (2) he immediately began smoking a cigarette while standing outside of the police vehicle. Although Trooper Adams had informed defendant that he was only receiving a warning for the illegal window tint, defendant's nervous behavior continued to escalate throughout the stop. Trooper Adams had significant training on motor vehicle stops and deceptive behavior, and at

the time of this stop, he had over five years' experience as a patrol officer.  Most of his trainings were geared towards narcotics trafficking.  And most recently, Trooper Adams was assigned as an officer within a SHIELD Unit.  Based on his training, experience, and common sense, the Court finds that Trooper Adams reasonably concluded that these signs indicated nervousness.  Cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[C]ourts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.  Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.").  Although an individual's nervous behavior alone cannot conclusively establish reasonable suspicion, it can contribute to it.  See id. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

In addition to defendant's nervous behavior, Trooper Adams observed other things that alluded to narcotics trafficking activities based on his training and experience.  Defendant revealed that he was traveling the Pennsylvania Turnpike, which is a known "drug smuggling corridor," from Pittsburgh, Pennsylvania, to Hagerstown, Maryland, to purchase discounted winter coats for his children.  It was October and defendant's children were not in the vehicle with him.  See Garner, 961 F.3d at 272 (noting that Defendants' journey along a known drug trafficking corridor is a relevant consideration that can give rise to reasonable suspicion).  Through his training and experience, Trooper Adams knew that Pittsburgh, Pennsylvania, was a known source area for narcotics and a source destination for drugs in the Northeastern region, and Hagerstown, Maryland, was a high-crime area.  Moreover, the trip from Pittsburgh to Hagerstown is a six-hour round trip, and defendant disclosed that he was only planning on being at an outlet mall in Hagerstown for approximately two hours.  Trooper Adams found defendant's proffered reason for such a long trip to be unconvincing.  His training and experience provided

him with the knowledge that individuals involved in criminal activity will often make short turn-around trips, returning home after conducting their criminal activity.  And questions relating to a driver's travel plans are ordinary inquiries incident to a traffic stop.  See United States v. Caraballo, 104 F. App'x 820, 822 (3d Cir. 2004) (finding that a traffic stop was not improperly extended by questions about vehicle occupants' travel plans);  Givan, 320 F.3d at 459 ("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."); United States v. Quintanilla, No. CRIM. 3:2006-17, 2006 WL 3392439, at *5 (W.D. Pa.) ("Questioning of the driver as to any 'travel plans' ... [is] within the 'proper scope of a traffic stop.'").  Therefore, the conversation regarding defendant's itinerary did not extend the stop beyond its traffic-based purpose.

Additionally, the Buick was newly registered to a woman named Jennifer White, whom defendant identified as his girlfriend. She was not in the Buick at the time of the stop.  Trooper Adams knew that individuals involved in criminal activity often "flip[] the [license] tags and re-register[] [vehicles] in an attempt to not have the same license plate sequence on the vehicle for an extended period of time [in order] to thwart license plate reader systems [and avoid] ongoing surveillance . . . ."

Further, defendant had a criminal history that included federal narcotics and firearm violations.  See Green, 897 F.3d at 187 (An officer is justified in considering a suspect's prior drug arrests in assessing whether he has reasonable suspicion that drug trafficking is occurring). While a criminal record alone is not sufficient for an officer to establish reasonable suspicion, it is a factor.  See id. (citing United State v. Mathurin, 561 F.3d 170, 177 (3d Cir. 2009).

After conducting a driver's license query on defendant, which is standard procedure during a traffic stop, Trooper Adams learned that defendant also was on federal supervised

release.  Although defendant was on federal supervise release, he physically was out of the Western District of Pennsylvania.

A law enforcement officer's criminal history check on a defendant does not extend a traffic stop outside of its traffic and safety-related purposes.  See Rodriguez, 135 S. Ct. at 1616 (recognizing that an officer may need to take safety precautions during a traffic stop, including running a criminal history check); United States v. Frierson, 611 F. App'x 82, 85 (3d Cir. 2015) ("Upon initially detaining the men, [the officer] reasonably addressed the traffic violation that warranted the stop and attended to safety concerns.  For example, any preliminary delay in checking [the driver's] license, registration, and criminal history was justified as part of the stop.");  United States v. Palmer, 820 F.3d 640, 651 (4th Cir. 2016) ("A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop.");  United States v. Sanford, 806 F.3d 954, 956 (7th Cir. 2015) ("The trooper checked the occupants' criminal history on the computer in his car—a procedure permissible even without reasonable suspicion. . . .").  Gaining the knowledge that defendant was on supervised release and outside the jurisdiction of his residence did not unequivocally extend the traffic stop.

Moreover, in response to Trooper Adams' questions of whether there was anything illegal in the Buick, such as drugs, guns, or large amounts of currency, defendant first replied "Huh?", then answered that he had "some thousands" in the car, further divulging that he had approximately $30,000.00 in the vehicle.   Such generic inquiries about contraband or the presence of suspicious items does not unequivocally expand a lawful traffic stop.  See U.S. v. Griggs, 114 F.Supp.2d 334, 343 (M.D. Pa. 2000) (finding that it was "entirely reasonable for a police officer to intrude minimally on a driver's personal security and extend a routine traffic stop by . . . . [asking] "Is there anything illegal in your car?").  Based on his training, experience,

and the totality of the circumstances, Trooper Adams formed the belief that defendant was transporting a large sum of cash in order to purchase drugs.

Thus, considering the totality of the circumstances objectively, the Court finds that these facts in conjunction with Trooper Adams' training and experience as a SHIELD officer supplied him with reasonable suspicion that criminal activity was afoot. Trooper Adams gained this suspicion before the stop and through his initial traffic-related inquiries, and he did so before he **measurably** extended the stop. Accord United States v. Wilson, 960 F.3d 136, 146 (3d Cir. 2020) (through traffic stop-related inquiries, the officer had developed sufficient reasonable suspicion to investigate the occupants of the vehicle for drug trafficking); see also Garner, 961 F.3d at 271 ("We hold Trooper Ramirez had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred.")

For these reasons, Trooper Adams possessed the requisite reasonable suspicion well before the point at which defendant contends he unlawfully extended the stop. So even if Trooper Adams extended the traffic stop at some point thereafter, it was lawful for him to do so. Consequently, defendant's Motion to Suppress will be denied to the extent defendant argues that the traffic stop was unlawfully extended due to a lack of reasonable suspicion that criminal activity was afoot.

Defendant also argues that his consent to search was obtained "unlawfully" because "it was the product of an unlawfully extended stop and was the result of unlawful interrogation that occurred without [] Miranda warnings being given." Motion to Suppress, Doc. No. 60, Page 21. Defendant argues that Trooper Adams' questioning during the stop amounts to a custodial interrogation which requires "appropriate and meaningful Miranda warnings." As a consequence of Trooper Adams failing to read defendant his Miranda rights, defendant maintains that all

statements made during the supposed custodial interrogation, including him supplying his cell phone number, were obtained in violation of the Fifth Amendment.  And everything that followed was "fruits of the poisonous tree."  As a result, in defendant's view the authorized search warrants and all evidence that was collected through the execution of those warrants should be suppressed.

In response, the government contends that Trooper Adams was not required to read defendant his Miranda rights because they are only required when a suspect is formally placed under arrest.  It argues that defendant was not physically restrained, there was minimal police presence during the traffic stop, Trooper Adams' conversation with defendant was "relaxed . . . [and] never [rose] to [the level of] an interrogation."  And this was the case even after he found the $36,500.00 in the Buick.  Because defendant was never in custody, the government maintains that Trooper Adams did not violate defendant's rights and all statements made by him were lawfully obtained, including the supplying of his cell phone number.

Moreover, because from the government's perspective defendant's phone number was lawfully obtained in order to provide him with a receipt for the seized cash, Trooper Nagy's subsequent inclusion of that phone number in the ping affidavits was proper.  The government thus further maintains that the ping information obtained pursuant to the warrants issued pursuant to those applications/affidavits should not be suppressed.

As discussed above, the Court has concluded that the traffic stop was not unlawfully extended.  Therefore, the Court will first address whether defendant's consent for Trooper Adams to search the Buick was "unlawfully" obtained.  It will then determine whether Trooper Adams was required to read defendant his Miranda rights at any point during the traffic stop.

"In simple terms, an officer certainly may ask - incident to a lawful traffic stop - for consent to search based on a hunch, or indeed, on nothing at all."  United States v. White, 80 F.

24

App'x 230, 231 (3d Cir. 2003).  A search conducted pursuant to consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009).  To be valid, however, the "consent must be voluntarily made, and the person giving consent to search must have the authority to do so."  United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988).  The government bears the burden to show, by a preponderance of the evidence, that the consent was valid.  United States v. Matlock, 415 U.S. 164, 177, n.14 (1974).

Here, the parties do not dispute that the initial traffic stop was lawful.  Therefore, Trooper Adams was permitted to ask defendant to search the Buick.  Further, government does not contest that defendant has standing to challenge the search of the Buick and there is no dispute that defendant had the authority to consent to the search of the Buick.  Although the Buick was registered to a woman named Jennifer White, defendant informed Trooper Adams that Ms. White was his girlfriend and that he occasionally drove the vehicle.  "Authority to consent to a search arises from mutual use of the property by persons generally having joint access or control for most purposes[.]"  Morales, 861 F.2d at 399.  It does not matter here that Ms. White, who was not present during the traffic stop, also did not expressly consent to the search of the Buick. Matlock, 415 U.S. at 171 ("[It is] clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by defendant but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.").  More importantly, defendant states that "[a]t all times material hereto, the [d]efendant had the consent of the owner of said vehicle to be in possession of and to operate the vehicle that the [d]efendant was operating on October 8, 2021."  See Motion to Suppress, Doc. No. 60, Page 9.

Turning to the disputed issue of whether defendant's consent was voluntary, the Court must consider the totality of the circumstances before rendering a decision.  See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); Price, 558 F.3d at 278 ("There is no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." (cleaned up)).  Courts consider several factors to determine voluntariness, no single one of which is dispositive.  See Price, 558 F.3d at 278. Factors that may be relevant include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; the use of physical punishment; the setting in which the consent was obtained; and the parties' verbal and non-verbal actions.  Id. (citations omitted). While it's a consideration in this analysis, "the government is not required to advise defendant of his right to refuse consent before eliciting his consent."  Id. at 279.

Considering the totality of the circumstances, the Court finds that defendant voluntarily consented to the search of the Buick.  As the video footage of the traffic stop shows, Trooper Adams was polite to defendant throughout the traffic stop.  His tone was pleasant and conversational, and he did not speak or behave in a threatening manner towards defendant.  Also, defendant was not touched, restrained, or handcuffed by Trooper Adams prior to defendant giving Trooper Adams consent to search.  Additionally, although Trooper Adams told defendant he had to wait five minutes to use the restroom on the side of the highway because he was waiting for Trooper Marmol to arrive, defendant was permitted to relieve himself close to five minutes later.  Further, Trooper Adams was the only trooper present when defendant consented to the search, and Trooper Marmol was the only trooper that arrived thereafter to assist in the

search.  And the traffic stop occurred during the middle of the day on a busy highway.  See

United States v. Velasquez, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding no coercion when

"consent took place on the shoulder of a major highway during daylight hours").

Moreover, defendant's age, education, and intelligence do not establish that he could not

provide voluntarily consent or understand what was being requested of him.  An argument has

not been presented to the contrary, and the Court is not aware of any circumstances related to his

age, education, or intelligence that would even suggest he was unaware that he was giving

consent to search the Buick or otherwise was unable to provide voluntary consent.

Although the Court finds that defendant voluntarily consented to the search, it is

cognizant that defendant twice denied Trooper Adams consent to search the vehicle.  However,

once Trooper Adams voiced his concerns about the possibility of ongoing criminal activity and

indicated that he would "call a dog" to the scene, defendant responded "a dog? Go ahead and

search," thereby clearly consenting to a search of the Buick.  While "measures aimed at detecting

criminal activity more generally," such as a dog sniff, cannot be performed in a way that

measurably extends the stop unless the officer has reasonable suspicion,[3] we have already

determined that Trooper Adams had reasonable suspicion that criminal activity was occurring

during the initial first few minutes of the traffic stop and before he indicated he planned on

"call[ing] a dog" to the scene.  As stated above, although Trooper Adams did not inform

defendant that he could refuse consent, he was not required to do so.  Additionally, because we

have determined that Trooper Adams had reasonable suspicion that criminal activity was afoot, it

was not improper for Trooper Adams to indicate that he was going to call a narcotics-detection

dog to the scene.  See Garner, 961 F.3d at 272 (Trooper only needed reasonable suspicion that

_____

[3]     See Green, 897 F.3d at 179-80 (citing Rodriguez, 135 S. Ct. at 1615).

criminal activity was occurring to conduct a dog sniff); <u>see</u> <u>also</u> <u>Illinois</u>, 543 U.S. at 409 (a dog

sniff conducted during lawful traffic stop does not violate the Fourth Amendment).

Finally, defendant blanketly asserts that "all statements" made by him during the traffic

stop should be suppressed.  He focuses on the admissibility of the telephone number he gave to

Trooper Adams that was later utilized by Trooper Nagy in the affidavits crafted in order to obtain

search warrants.  Defendant argues that Trooper Adams detained him and engaged in a custodial

interrogation during the pendency of the traffic stop because he was not free to leave.  And

because Trooper Adams engaged in a conversation with defendant and asked him several

questions without advising him of his <u>Miranda</u> rights, defendant's rights were violated.

As alluded to above, the government counters that <u>Miranda</u> does not apply to traffic stops

because individuals detained during traffic stops are not "in custody."  As a result, any

statements made by an individual during a traffic stop do not implicate <u>Miranda</u> rights and

should not be suppressed.

Defendant's statements to Trooper Adams will not be suppressed because Trooper Adams

did not violate defendant's right against self-incrimination.  The Fifth Amendment's Self-

incrimination Clause provides: "No person ... shall be compelled in any criminal case to be a

witness against himself."  <u>U.S. Const. Amend. V</u>.  In <u>Miranda v. Arizona</u>, the Supreme Court

created a rule of criminal procedure intended to curtail coercive interrogation techniques.  384

U.S. 436 (1966).  However, the rule set forth in <u>Miranda</u> only applies when a defendant is both in

custody and subject to interrogation.  <u>See</u>, <u>e.g.</u>, <u>Estelle v. Smith</u>, 451 U.S. 454, 466–67 (1980).

A routine traffic stop does not constitute custody under <u>Miranda</u>.  <u>See</u> <u>Maryland v.</u>

<u>Shatzer</u>, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention

involved in a traffic stop or <u>Terry</u> stop does not constitute <u>Miranda</u> custody."); <u>Howes v. Fields</u>,

565 U.S. 499, 509-10 (2012) (affirming that "a person detained as a result of a traffic stop is not

in Miranda custody"); Berkemer v. McCarty, 468 U.S. 420, 437 (1984) (same).  Although "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," routine traffic stops do not "sufficiently impair [the] free exercise of [their] privilege against self-incrimination to require that [they] be warned of [their] constitutional rights."  Berkemer, 468 U.S. at 437.

Miranda must only be enforced "in those types of situations in which the concerns that powered the decision are implicated."  Id.  A restriction on defendant's freedom of movement, while a necessary condition, is not sufficient to create Miranda custody.  Id.  Rather, Miranda applies during a traffic stop "as of the moment [the suspect is] formally placed under arrest." United States v. Ley, 876 F.3d 103, 109 (3d Cir. 2017) (alteration in original) (quoting Berkemer, 468 U.S. at 434).  Specifically, Miranda warnings are not required when the suspect is not handcuffed or otherwise restrained.  See Berkemer, 468 U.S. at 440 (asking whether the motorist is in custody "for practical purposes" absent a formal arrest).  And when an individual is not in Miranda custody, any statements made by the suspect may be used against him without running afoul of the Fifth Amendment.

Miranda was primarily concerned with utilizing a defendant's statements against him at trial when he was not warned that they could be used in such a manner.  The Court was concerned that the "inherently compelling pressures" of a custodial interrogation would overwhelm an individual's capacity to remain silent.  Miranda, 384 U.S. at 467.  And without an individual being in custody, Miranda is not implicated.

Here, defendant's statements throughout the traffic stop, including his voluntary statement revealing his telephone number, were not obtained in violation of Miranda.[4]  As

---

[4]     While defendant makes a blanket assertion that "all statements" he made to Trooper Adams should be suppressed, the only information concerning the October 2021 traffic stop that was contained in each of the affidavits of probable cause ("Affidavits of Probable Cause")

discussed above, defendant was not restrained or handcuffed during the stop.  Defendant

remained outside the passenger door of the police vehicle and was permitted to smoke multiple

cigarettes and drink a soda he had retrieved from the Buick.  Further, defendant appeared very

cooperative and engaged with both Troopers Adams and Marmol throughout the duration of the

stop.  While Trooper Adams was filling out and explaining the forfeiture receipt for the cash

seized, defendant initiated and engaged in a friendly conversation with him throughout the

process.  While defendant asked questions related to the traffic stop, including whether Trooper

Adams would have confiscated the cash if there was only $9,000.00 or $10,000.00 in the Buick,

he also asked questions and made statements unrelated to the stop.  For example, defendant

asked Trooper Adams whether he was a Steeler fan, discussed his personal gambling habits,

joked that he was a "degenerate gambler" and said that he would bet $300.00 that Trooper

Adams could beat Trooper Marmol in a foot race.  He also voluntarily disclosed that gambling

was a habit he picked up in prison, divulged that he "whooped a couple ass" in prison over

disputes regarding the Steelers, and joked that he told Trooper Marmol that if the troopers had

left behind the handheld x-ray machine that they used to search the Buick he would have "put

that bitch on the black market."

   After Trooper Adams finished writing defendant's forfeiture receipt, Trooper Adams gave

him back his license, registration, and a copy of receipt.  Defendant also continued speaking and

---

crafted by Trooper Nagy were (1) defendant was stopped by the Pennsylvania State Police in
October of 2021; (2) approximately $36,000.00 was found in defendant's vehicle subsequent to a
consensual search; (3) a K-9 dog "alerted" to the odor of controlled substances on the seized
cash; and (4) defendant's phone number.  See Affidavits of Probable Cause, Exhibit "A" at Doc.
No. 60-1, Page 10, ¶ 12; Exhibit "B" at Doc. No. 60-2, Page 11, ¶ 26; Exhibit "C" at Doc. No.
60-3, Page 11, ¶ 24; Exhibit "D" at Doc. No. 60-4, Page 31, ¶ 24; and Exhibit "E" at Doc. No.
60-5, Page 9, ¶ 17.  Because the Court finds that the information contained within each affidavit
was lawfully obtained, the statements contained therein and the search warrants issued based on
these statements will not be suppressed.

"joking around" with Trooper Marmol, evening embracing him in a handshake and arm embrace before leaving the scene.  Thereafter, defendant got into his car and drove away.

Because defendant was not in custody, the statements he made during the traffic stop, including providing his telephone number, will not be suppressed.  For the foregoing reasons, defendant's Motion to Suppress will be denied as to defendant's argument that all statements obtained by Trooper Adams during the stop should be suppressed because they were obtained in violation of defendant's <u>Miranda</u> rights.

But even assuming that the Court had found that defendant was in custody and Trooper Adams was required to read him his <u>Miranda</u> rights before asking defendant for his telephone number, certain "routine" questions are admissible as established exceptions under <u>Miranda</u>.  The Supreme Court has opined that certain questions an officer might ask relating to booking or pretrial services fall outside the perimeters of <u>Miranda</u>.  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601-02 (1990).  Therefore, "[q]uestions regarding a suspect's name, address, height, weight, eye color, date of birth, current age, or matters reasonably related to the police's administrative concerns that are not designed to elicit incriminatory admissions" are exempt from <u>Miranda</u> protections.  <u>U.S. v. Algarraobo</u>, Crim. No. 00-318, 2000 WL 1886595, * 2 (E.D. Pa. Dec. 14, 2000), citing, <u>Muniz</u>, 496 U.S. at 601-602, 110 S.Ct. 2638; <u>see also</u> <u>United States v. Jackson</u>, 2024 WL 150224, *29 (E.D.Pa., 2024); <u>United States v. Kent</u>, 2021 WL 816905, *4 (E.D. Pa. 2021).  Even though a telephone number is not specifically identified in <u>Muniz</u>, "there is 'no reason to treat a request for a telephone number [] any differently than the elicitation of the routine types of identifying information that courts have long found to lie within the <u>Muniz</u> exception to <u>Miranda</u>.'  A 'person's telephone number is as much a part of his identity as is his name, address, and date of birth.'"  <u>Kent</u>, 2021 WL 816905 at *1.  This is particularly so here where the telephone number was volunteered as part of providing defendant with a receipt for

the confiscated cash.  Accordingly, defendant's statement of his telephone number is not subject to suppression for this independent reason as well.

Finally, even assuming for the sake of argument that Trooper Adams unlawfully obtained defendant's cell phone number that was later utilized by Trooper Nagy in affidavits of probable cause, the evidence obtained would nevertheless be admissible under the good faith exception to the exclusionary rule established in United States v. Leon, 468 U.S. 897 (1984); see also United States v. Hodge, 246 F.3d 301, 307-08 (3d Cir. 2001) ("The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.").  Under the good faith exception, suppression of evidence is "inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority."  United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993).

"The test for whether the good faith exception applies is whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate [judge's] authorization."  Loy, 191 F.3d at 367 (quoting Leon, 468 U.S. at 922 n. 23).  While the mere existence of a warrant is typically enough to prove that an officer conducted a search in good faith, Leon, 468 U.S. at 922, the Third Circuit has recognized certain situations where an officer's reliance on a warrant nevertheless would be unreasonable and would not trigger the good faith exception:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Hodge, 246 F.3d 301 (internal quotations and citations omitted).

Defendant maintains that the good faith exception does not apply because Trooper Nagy "was well-aware of the inaccuracies and violations committed by Trooper Adams at the time [Trooper Nagy] drafted each affidavit/application for [sic] search warrant." Defendant's Rely to Government's Omnibus Response, Doc. No. 87, Page 13. Further, defendant argues that "[t]he conduct of Trooper Nagy in presenting the affidavit/applications each time for the "ping" and search warrants was deliberate, reckless, or grossly negligent, the suppression and exclusion of the evidence obtained should be granted." Id. at 15-16. Despite making these accusations, defendant fails to present any evidence to support them.

Defendant has failed to present any evidence that (1) Trooper Nagy failed to act in good faith in crafting the affidavits of probable cause by utilizing the telephone number provided to him by Trooper Adams; or (2) that Trooper Nagy, the Pennsylvania State Police, or the FBI failed to act in good faith when executing the issued warrants. Furthermore, the affidavits in support of the warrants are not so clearly lacking in probable cause that no reasonable police officer objectively could believe that, despite the judge's authorization, the law prohibited them from obtaining defendant's ping data or from conducting the subsequent searches of Key Drive, Cedar Ridge Drive, and Ridge Avenue. Thus, the good faith exception would be satisfied in any event.

Accordingly, there is no basis to suppress the evidence that was obtained through the Washington County ping warrant, the federal ping warrants, or the search warrants for Key Drive, Cedar Ridge Drive, or Ridge Avenue. Those warrants were not fruit of the poisonous tree. As a result, defendant's motion to suppress on this ground also will be denied.

For the reasons set forth above, defendant's motion to suppress will be denied. An

appropriate order will follow.

<u>Date: September 9, 2024</u>

<u>s/David Stewart Cercone</u><br>
David Stewart Cercone<br>
Senior United States District Judge

cc:    Jerome A. Moschetta, AUSA
        Frank A. Rubino, Esquire

        *(Via CM/ECF Electronic Mail)*